**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 25-CR-463-GKF** |
| | ) | |
| **LOGAN CHRISTOPHER MURFIN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**DEFENDANT'S OPPOSED MOTION TO DISMISS INDICTMENT**[1]</u>

Dated: February 20, 2026

By: *s/Jared T. Guemmer*
Jared T. Guemmer
Mo. Bar No. 69109
Assistant Federal Public Defender
Office of Federal Public Defender
One West Third St., Ste. 1225
Tulsa, Oklahoma 74103
(918) 581-7656
Jared_Guemmer@fd.org

---

[1] Counsel has contacted Counsel for the United States to ask if it opposes this Motion. Counsel has not yet received a response, but he assumes the United States opposes this Motion because it seeks dismissal of the entire Indictment.

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES...................................................................................................... iv

BACKGROUND ....................................................................................................................1

ARGUMENT .........................................................................................................................2

    I.    **The Supreme Court's First Amendment decisions branch into two distinct paths: True Threats and Incitement to Imminent Lawless Action. Each involves a different analysis and have different requirements that must be met to take a statement outside of the First Amendment's protections** ............................................................2

        a.    **The *Brandenburg* Line of Cases – Incitement to Imminent Lawless Action** ......3

        b.    **The *Watts* Line of Cases – True Threats** ................................................................9

    II.    **Tenth Circuit Law** .................................................................................................12

        a.    **Reviewing Motions to Dismiss**..............................................................................12

        b.    **Definition of Threats** .............................................................................................13

    III.    **Courts have drawn a consistent line between speech that is protected and unprotected. The key distinction is whether the speaker demonstrates through their words that they, or someone within their sphere of influence, will carry out an attack on the subject of the statement.** ....................................................................14

        a.    *United States v. Viefhaus*, **168 F.3d 392 (10th Cir. 1999)**....................................14

        b.    *United States v. Bagdasarian*, **652 F.3d 1113 (9th Cir. 2011)** ...............................15

        c.    *United States v. White*, **670 F.3d 498 (4th Cir. 2011)** ............................................16

        d.    *United States v. Wheeler*, **776 F.3d 736 (10th Cir. 2015)**......................................17

        e.    *United States v. Dillard*, **795 F.3d 1191 (10th Cir. 2015)**......................................18

        f.    *United States v. Stevens*, **881 F.3d 1249 (10th Cir. 2018)** .....................................19

    IV.    **Mr. Murfin's alleged statements do not, as a matter of law, constitute true threats, nor do they constitute incitement to imminent lawlessness or violence. Therefore, the statements are protected speech and may not serve as the basis of criminal charges** ...............................................................................................................20

CONCLUSION..................................................................................................................24

CERTIFICATE OF SERVICE .........................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brandenburg v. Ohio*,
  395 U.S. 444 (1969)..................................................................2–5, 7–9, 20, 22, 23

*Counterman v. Colorado*,
  600 U.S. 66 (2023)....................................................................7, 8, 11, 12, 21, 23

*Dennis v. United States*,
  341 U.S. 494 (1951).............................................................................................4

*Elonis v. United States*,
  575 U.S. 723 (2015)..............................................................................10–13, 21

*Hess v. Indiana*,
  414 U.S. 105 (1973)...............................................................................4, 5, 7, 8, 23

*N.A.A.C.P. v. Claiborne Hardware Co.*,
  458 U.S. 886 (1982)...............................................................................5–8, 23

*United States v. Bagdasarian*,
  652 F.3d 1113 (9th Cir. 2011) ...............................................................15, 18, 22

*United States v. Dillard*,
  795 F.3d 1191 (10th Cir. 2015) ...................................................................18–21

*United States v. Heineman*,
  767 F.3d 970 (10th Cir. 2014) ...........................................................................13, 21

*United States v. Pope*,
  613 F.3d 1255 (10th Cir. 2010) ............................................................................1

*United States v. Stevens*,
  881 F.3d 1249 (10th Cir. 2018) ..............................................................12, 19, 21

*United States v. Turner*,
  720 F.3d 411 (2d Cir. 2013)...............................................................................18

*United States v. Viefhaus*,
  168 F.3d 392 (10th Cir. 1999) .................................................................13, 14, 20, 21

*United States v. Welch*,
  327 F.3d 1081 (10th Cir. 2003) ............................................................................1

*United States v. Wheeler*,
  776 F.3d 736 (10th Cir. 2015) .........................................................12, 17, 18, 20

*United States v. White*,
  670 F.3d 498 (4th Cir. 2011) ...........................................................16–18, 22

*Virginia v. Black*,
  538 U.S. 343 (2003)...........................................................................10, 12

*Watts v. United States*,
  394 U.S. 705 (1969)..................................................................2, 9, 11, 12, 20, 22

*Yates v. United States*,
  354 U.S. 298 (1957)...........................................................................24

**Statutes**

18 U.S.C. § 115(a)(1)(B) ...........................................................................1

18 U.S.C. § 875(c) ................................................................................1, 10

**Other Authorities**

Fed. R. Crim. P. 12(b)(3)(B)(v) ...........................................................................1

U.S. Const. amend. I ...........................................................................2–12, 18, 23

*Webster's Third New International Dictionary* 2382 (1976) .......................................15

COMES NOW, Logan Christopher Murfin, by and through counsel, and submits this Motion to Dismiss pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v). "Where a defendant challenges the sufficiency of an indictment for failure to state an offense, a court generally is bound by the factual allegations contained within the four corners of the indictment." *United States v. Welch*, 327 F.3d 1081, 1090 (10th Cir. 2003). However, courts may consider facts outside of the indictment when: "[1] the operative facts are undisputed and [2] the government fails to object to the district court's consideration of those undisputed facts, and [3] the district court can determine from them that, *as a matter of law*, the government is incapable of proving its case beyond a reasonable doubt." *United States v. Pope*, 613 F.3d 1255, 1260 (internal quotation marks omitted).

## BACKGROUND

The United States of America has charged Mr. Murfin with two categories of offenses: (1) Threatening to assault or murder federal law enforcement officers with intent to impede, intimidate, or interfere with those law enforcement officers in violation of 18 U.S.C. § 115(a)(1)(B); and (2) Transmitting communications containing threats to injure federal law enforcement officers in violation of 18 U.S.C. 875(c). (ECF No. 2). The ten counts against Mr. Murfin are grouped into pairs, a Section 115 and Section 875 charge for each of the five statements the United States relies upon. The alleged threats are set forth in Attachment A to this Motion.

Each statement was posted on the social media platform, "X" (formerly known as Twitter). Shortly after Mr. Murfin's indictment, the official U.S. Immigration and Customs Enforcement page on Facebook and on Truth Social posted a photo of Mr. Murfin in handcuffs and described his statements as saying that "federal agents need to be gunned down, shot & executed." (Attachment B). It followed by saying "Welcome to the find out stage, Logan." (Attachment B).

1

**ARGUMENT**

Mr. Murfin seeks dismissal on the grounds that the charges against him violate his First Amendment right to freedom of speech. The United States accuses Mr. Murfin of threatening to assault or murder federal law enforcement officers (and with transmitting threats to injure them).

This Motion will address the protected status of Mr. Murfin's alleged conduct through four steps. First, it will set forth the key Supreme Court law concerning both threats and incitement. Next, this Motion will address relevant points of Tenth Circuit law that have developed over time. Then, this Motion will discuss a variety of cases analyzing whether statements were true threats. After providing this backdrop, this Motion will discuss Mr. Murfin's alleged statements and why they are protected under the First Amendment. As will become clear through this Motion, Mr. Murfin's alleged statements do not even constitute threats, let alone "true threats," because they fail to communicate his intent to commit the acts violence described therein. Moreover, Mr. Murfin intends to demonstrate that the charges against him should be dismissed *with prejudice* because they are also protected under the Supreme Court's standard for incitement to imminent lawlessness.

I.  **The Supreme Court's First Amendment decisions branch into two distinct paths: True Threats and Incitement to Imminent Lawless Action. Each involves a different analysis and have different requirements that must be met to take a statement outside of the First Amendment's protections.**

In 1969, the Supreme Court decided two cases that would redefine the nature of First Amendment protections: *Watts v. United States*, 394 U.S. 705 (1969), and *Brandenburg v. Ohio*, 395 U.S. 444 (1969). *Watts* created the "true threat" requirement that removes such statements from First Amendment protection, while *Brandenburg* displaced the "Clear and Present Danger" test in favor of the "Incitement to Imminent Lawless Action" test.

### a.    The *Brandenburg* Line of Cases – Incitement to Imminent Lawless Action

*Brandenburg* is a surprisingly straightforward decision considering its importance. There, a Ku Klux Klan rally was filmed and later broadcast on local and national news networks. *Brandenburg*, 395 U.S. at 445. The film showed members carrying firearms; it included a speech indicating the KKK has hundreds of members throughout Ohio and the following statement: "The Klan has more members in the State of Ohio than does any other organization. We're not a revengent organization, but if our President, our Congress, our Supreme Court, continues to suppress the white, Caucasian race, it's possible that there might have to be some revengeance taken." *Id.* at 446. A second film dropped references to "revengeance," and included an additional statement: "Personally, I believe the n[*****] should be returned to Africa, the Jew returned to Israel." *Id.* at 447.

While the majority's *per curiam* opinion in *Brandenburg* stopped short of explicitly and unambiguously throwing out the old "Clear and Present Danger" test, both Justices Black and Douglas made it clear that they considered the test dead. The *per curiam* opinion set forth the following principles, which have guided First Amendment analysis since: "[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Id.* at 447. Further, "the mere abstract teaching of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action." *Id.* at 448 (internal quotation marks and ellipsis omitted). The Supreme Court then concluded: "We are here confronted with a statute which, by its own words and as applied, purports to punish mere advocacy and to forbid, on pain of criminal punishment, assembly with others merely to advocate

3

the described type of action. Such a statute falls within the condemnation of the First and Fourteenth Amendments." *Id.* at 449 (internal footnote omitted).

Justice Black's short concurrence joins the majority opinion with the understanding the majority does not agree with, or otherwise adopt, the "Clear and Present Danger" test moving forward. *Id.* at 449–59 (Black, J., concurring). Justice Douglas wrote a much longer concurrence; in it, he excoriated the prior test and concluded that the threats found unprotected "were often loud but always puny and made serious only by judges so wedded to the status quo that critical analysis made them nervous," and he further noted that "the test was so twisted and perverted in *Dennis* [*v. United States*, 341 U.S. 494 (1951)] as to make the trial of those teachers of Marxism an all-out political trial which was part and parcel of the cold war that has eroded substantial parts of the First Amendment." *Id.* at 454 (Douglas, J., concurring). Justice Douglas opining that "[t]he quality of advocacy turns on the depth of the conviction; and government has no power to invade that sanctuary of belief and conscience." *Id.* at 457.

The next notable case came only four years later in *Hess v. Indiana*, 414 U.S. 105 (1973). There, the defendant was charged with, and convicted of, disorderly conduct related to an antiwar demonstration on a public street that blocked the movement of vehicles. *Id.* at 106. The demonstrators moved to the sidewalks and out of the street when deputies began ushering them in that direction. *Id.* While this was occurring, the defendant turned to the crowd near him and said one of two phrases: "We'll take the fucking street later," or "We'll take the fucking street again." *Id.* at 107. Testimony from witnesses stated the defendant did not appear to be "exhorting the crowd to go back into the street," and his statements did not seem to be addressed to any particular person. *Id.*

4

The Supreme Court quickly dispensed with any obscenity or fighting words limitation on the defendant's speech, *id.* at 107–08, and it moved to analyze the words used under the incitement limitation set forth in *Brandenburg*. *Id.* at 108. To this, the *per curiam* Supreme Court concluded that "at worst, [this speech] amounted to nothing more than advocacy of illegal action at some indefinite future time." *Id.* Therefore, it held the defendant's statements were protected under the First Amendment. *Id.* "Since the uncontroverted evidence showed that [defendant's] statement was not directed to any person or group of persons, it cannot be said that he was advocating, in the normal sense, any action." *Id.* at 108–09. Moreover, "there was no evidence or rational inference from the import of the language, that his words were intended to produce, and likely to produce, imminent disorder, those words could not be punished by the State on the ground that they had a tendency to lead to violence." *Id.* at 109.

One more major case addressing advocacy is *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886 (1982). The decision in *Claiborne Hardware* is much longer than those of *Brandenburg* and *Hess*; it is also unanimous. This case concerned the advocacy done in furtherance of a boycott of white merchants in part of Mississippi as part of a movement for racial equality. *Id.* at 889. This advocacy included store watchers, picketers, and individuals who would seek to persuade potential customers from patronizing the stores. *Id.* at 893. There were further allegations that individuals engaged in violence or threatened violence in order to coerce others to participate in the boycott, and allegations that Charles Evers (a leader of the N.A.A.C.P. in the region) specifically "threatened violence on a number of occasions against boycott breakers." *Id.* at 897–98.

The Supreme Court explained that organizers used both public speech and more direct solicitation of people to join the boycott. *Id.* In some instances, the organizers would ensure that the names of those breaking the boycott were read aloud in church gatherings in an effort to shame

5

those who did not participate. *Id.* The Supreme Court found this to be protected: "Speech does not lose its protected character, however, simply because it may embarrass others or coerce them into action." *Id.* at 910. The Supreme Court explained, "offensive and coercive speech is . . . protected by the First Amendment." *Id.* at 911 (citing *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 418 (1971)). While the Supreme Court briefly entertained the notion that "States have broad power to regulate economic activity," it rejected that as a basis for prohibiting the activity at issue:

> This Court has recognized that expression on public issues has always rested on the highest rung of the hierarchy of First Amendment values. Speech concerning public affairs is more than self-expression; it is the essence of self-government. There is a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.

*Id.* at 913 (internal citations and quotation marks omitted). To the extent the activities were nonviolent, the Supreme Court held them protected, but it also limited liability for any damages arising from violence: "Civil liability may not be imposed merely because an individual belonged to a group, some members of which committed acts of violence." *Id.* at 920.

The next key line of analysis looked to the conduct of Charles Evers. Mr. Evers was a leader in organizing the boycott, and he participated in negotiations to convince a particular group to stop buying from white merchants, presided over a meeting at which the vote to boycott was taken, delivered a speech to the audience during that same meeting, and delivered speeches on two other days. *Id.* at 926. Relevant to this case, the Supreme Court discussed three theories under which the merchants sought to hold Mr. Evers liable for the unlawful conduct of others. *Id.* at 927.

In this respect, the Supreme Court noted three key doctrines: Fighting Words, Words Creating an Immediate Panic, and Incitement to Imminent Lawlessness or Violence. *Id.* at 927. In doing, so, the Supreme Court reiterated: "This Court has made clear . . . that mere *advocacy* of the use of force or violence does not remove speech from the protection of the First Amendment." *Id.*

(emphasis in original). While Mr. Evers's speech included reference to "necks being broken," it "did not exceed the bounds of protected speech." *Id.* at 927 & 929. While Mr. Evers's role as a leader could lead to him being held liable for unlawful conduct—were there evidence that he actually authorized the unlawful conduct—no such evidence existed beyond the mere exhortations in his speeches:

> Strong and effective extemporaneous rhetoric cannot be nicely channeled in purely dulcet phrases. An advocate must be free to stimulate his audience with spontaneous and emotional appeals for unity and action in a common cause. When such appeals do not incite lawless action, they must be regarded as protected speech. To rule otherwise would ignore the profound national commitment that debate on public issues should be uninhibited, robust, and wide-open.

*Id.* at 928 (internal quotation marks omitted).

In its most recent First Amendment case, the Supreme Court had reason to very briefly address the concept of incitement. In *Counterman v. Colorado*, the Supreme Court acknowledged that the harm from speech that incites violence or lawlessness "can arise even when a clueless speaker fails to grasp his expression's nature and consequence." 600 U.S. 66, 76 (2023). However, the Supreme Court emphasized the importance of intent: "[T]he First Amendment precludes punishment, whether civil or criminal, unless the speaker's words were 'intended' (not just likely) to produce imminent disorder." *Id.* (quoting *Hess*, 414 U.S. at 109). On this matter, the *Counterman* Court recognized two key points: First, "incitement to disorder is commonly a hair's-breadth away from political 'advocacy'—and particularly from strong protests against the government and prevailing social order." *Id.* at 81. Thus, the First Amendment demands a stringent *mens rea* requirement. *Id.* Second, it recognized the Supreme Court's failures in the past "to protect mere advocacy of force or lawbreaking from legal sanction." *Id.* In effect, *Counterman* gave the backing of the majority of the Supreme Court to Justice Douglas's *Brandenburg* concurrence in which he rejected the Supreme Court's "Clear and Present Danger" case outcomes.

From these cases, a simple set of legal principles arise: First, a speaker's words must specifically be intended to incite imminent lawless action. *Counterman*, 600 U.S. at 76; *Hess*, 414 U.S. at 109; *Brandenburg*, 395 U.S. at 447. Second, imminent lawless action must actually be likely to arise from the words. *Brandenburg*, 395 U.S. at 447. Third, advocating violence or lawbreaking does not take words out of the ambit of First Amendment protections. *Claiborne Hardware*, 458 U.S. at 927. Fourth, there is a vital distinction between teaching or advocating the moral rightness of violence and preparing a group to engage in such action. *See Brandenburg*, 395 U.S. at 448. Fifth, even advocacy of lawlessness to a group of people in the speaker's presence is protected where the illegal action would take place at an indefinite point in the future. *Hess*, 414 U.S. at 107–08. Sixth, speech does not lose its protection merely because the ideas it expresses are crude, repugnant, and offensive, nor are they less protected than those expressed politely and thoughtfully. *Claiborne Hardware*, 458 U.S. at 928–29. And finally, just because the speaker speaks with conviction and means or believes what he says, his words do not lose their protection; as Justice Douglas explained in his *Brandenburg* concurrence, "[t]he quality of advocacy turns on the depth of the conviction; and government has no power to invade that sanctuary of belief and conscience." 395 U.S. at 457.

**b.    The *Watts* Line of Cases – True Threats**

*Watts*, like *Brandenburg*, is surprisingly straightforward given its import. In another *per curiam* decision, the Supreme Court deftly held the defendant's speech to be protected by the First Amendment. *Watts*, 394 U.S. at 706–07. The defendant's statements were made at a political rally in front of the Washington Monument in which he expressed opposition to the draft: "And now I have already received my draft classification . . . and I have got to report for my physical this Monday coming. I am not going. *If they ever make me carry a rifle the first man I want to get in my sights is L.B.J.* They are not going to make me kill my black brothers." *Id.* at 706 (emphasis added). This statement led to a charge that defendant had "knowingly and willfully" threatened the President. *Id.*

The Supreme Court concluded the statute was constitutional on its face, but not as applied to the defendant: "What is a threat must be distinguished from what is constitutionally protected speech." *Id.* at 707. The Supreme Court concluded that threatening language is protected by the First Amendment unless it constitutes a "true" threat. *Id.* at 708. Further, it determined that the "kind of political hyperbole indulged in by" the defendant did not fit that term. *Id.*

The Supreme Court reasoned that language must be interpreted "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wideopen, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.* (internal quotation marks omitted). It explained that political language "is often vituperative, abusive, and inexact." *Id.* Thus, it concluded that defendant's "only offense here was a kind of very crude offensive method of stating a political opposition to the President." *Id.* Therefore, the statement was protected and did not constitute a true threat.

9

It took 34 years, but the Supreme Court eventually defined what a "true threat" is in *Virginia v. Black*, 538 U.S. 343 (2003): "True threats encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Id.* at 359. Further, "[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." *Id.* at 360. While there is no requirement that the speaker actually intend to carry out the threat, the statement must reflect a serious expression of an intent to follow through. *Id.*

In *Black*, the Supreme Court had before it a cross-burning statute with two key provisions. The first prohibited cross-burning done with the intent to intimidate another person. *Id.* at 362. This was held constitutional because the message conveyed by cross-burning, combined with the specific intent to intimidate a particular person, satisfied the intimidation standard for true threats. *Id.* at 363. The second provision, however, failed constitutional scrutiny. Cross-burning in the abstract is expressive speech and protected by the First Amendment. *Id.* at 365–66. Thus, the statute's provision stating that the act of cross-burning itself was *prima facie* evidence of intent to intimidate was struck down. *Id.* at 366–67.

In 2015, the Supreme Court issued its decision in *Elonis v. United States*, 575 U.S. 723 (2015). There, the key question was whether 18 U.S.C. § 875(c) included a *mens rea* requirement as to the making of a threatening communication. *Id.* at 732. Ultimately, the Supreme Court held that a defendant's mental state is a required component of the crime, but it left the threshold *mens rea* for a later case. *Id.* at 740–42. More significantly for purposes of this Motion, however, the Supreme Court noted a few key definitions of what constitutes a threat: (1) "to declare (usually conditionally) one's intention of inflicting injury upon"; (2) "an expression of an intention to inflict

less or harm on another by illegal means", and; (3) "A communicated intent to inflict harm or loss on another." *Id.* at 732–33 (internal citations and quotation marks omitted). Additionally, whether a statement constitutes a threat is determined by what the statement conveys, not the speaker's mental state. *Id.* at 733. As part of this analysis, the Supreme Court provided an example of a threat: A letter that says, "I'm going to kill you." *Id.*

The most recent Supreme Court case touching upon true threats is *Counterman v. Colorado*. While this case was primarily concerned with determining the *mens rea* necessary to satisfy the First Amendment's true threats limitation, the Supreme Court included other key language that must also be heeded. As to the *mens rea*, the Supreme Court held that the First Amendment requires that a speaker be at least reckless with respect to whether his statements will be taken as a threat: "In the threats context, [recklessness] means that a speaker is aware 'that others could regard his statements as' threatening violence and 'delivers them anyway.'" *Counterman*, 600 U.S. at 79. In *Counterman*, the Supreme Court reiterated that "true threats" are only those statements that "are serious expressions conveying that a speaker means to commit an act of unlawful violence." *Id.* at 74 (internal quotation marks omitted). Further, true threats do not include those statements that "do not convey a real possibility that violence will follow." *Id.* They are to be distinguished from jests and hyperbole. *Id.*

These cases demonstrate the following legal principles: First, crude, offensive remarks, even those indicating a desire for someone to be killed, may be protected and fail to satisfy the true threats standard. *Watts*, 394 U.S. at 707–08. A speaker's statements must be understood with an understanding that there is a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wideopen," and that political language expressing opposition to those in power (or those seeking power) "is often vituperative, abusive, and inexact."

11

*Id.* at 708. Second, a speaker does not make a true threat unless the statement "communicate[s] a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Black*, 538 U.S. at 359. In *Elonis*, the Supreme Court's discussion demonstrates that threats are only those statements indicating that the speaker intends to inflict harm upon another person or group. 575 U.S. at 732–33. And in *Counterman*, the Supreme Court reiterated that true threats do not encompass statements that "do not convey a real possibility that violence will follow," and they must be distinguished from hyperbole and jests. 600 U.S. at 74.

## II.   Tenth Circuit Law

Before turning to further analysis, this Motion must first address two key points of Tenth Circuit law. Specifically, the manner in which courts within this Circuit review challenges made on First Amendment grounds, and how the Tenth Circuit defines threats.

### a.   Reviewing Motions to Dismiss

In *United States v. Stevens*, 881 F.3d 1249 (10th Cir. 2018), the Tenth Circuit discussed the standard of review applicable to challenges to motions to dismiss indictments on First Amendment grounds. First, it noted that "[w]hether a reasonable jury could find [the defendant's] statements to be true threats is a question of law." *Id.* at 1252. It further recognized that when "there is no question that a defendant's speech is protected by the First Amendment, the court may dismiss the charge as a matter of law." *Id.* (quoting *United States v. Wheeler*, 776 F.3d 736, 742 (10th Cir. 2015)). But it then stated, "absent an unusual set of facts, the question whether statements amount to true threats is a question generally best left to a jury." *Id.* (internal quotation marks omitted). Ultimately, "[i]f the court determines a reasonable jury could find that the communications constitute true threats, then it may deny the defendant's motion to dismiss." *Id.* (internal quotation marks, ellipsis, and alterations omitted).

**b.    Definition of Threats**

Under Tenth Circuit law, in order for a statement to be a threat, "the statement itself must be one that a reasonable person in the circumstances would understand 'as a declaration of intention, purpose, design, goal, or determination to inflict bodily injury on another.'" *United States v. Heineman*, 767 F.3d 970, 972 (10th Cir. 2014) (quoting *Viefhaus*, 168 F.3d at 395). The statement in question must reflect a serious threat "as distinguished from words as mere political argument, idle talk or jest." *Id.* at 972–73.

This is reasonably consistent with the description of threats set forth by the Supreme Court in *Elonis*. What is clear from this law is that a statement does not constitute a threat if it does not reflect that the speaker intends to bring about physical harm to the person the statement is about. While the speaker themselves need not necessarily intend to bring about the harm, the statement must convey a message (as understood by a reasonable person) that the speaker intends to bring about the harm.

**III. Courts have drawn a consistent line between speech that is protected and unprotected. The key distinction is whether the speaker demonstrates through their words that they, or someone within their sphere of influence, will carry out an attack on the subject of the statement.**

The following cases are presented in chronological order because they sometimes reference each other as they analyze whether a given statement constitutes a threat (or incitement).

a.    *United States v. Viefhaus*, **168 F.3d 392 (10th Cir. 1999).**

In *United States v. Viefhaus*, defendant formed a white supremacy organization and created a hotline through which he could deliver his messages; individuals could call in and listen to the messages he left on an answering machine. 168 F.3d at 394. Defendant was charged with using the telephone system to communicate a bomb threat based on the following statement:

> This is a war ... racial ... holy war. As an added ultimatum to those of you who are still unwilling to pick up a sword, a letter from a high ranking revolutionary commander has been written and received demanding that action be taken against the government by all white warriors by December 15th and if this action is not taken, bombs will be activated in 15 pre-selected major U.S. cities. That means December 15, 1996, one week from today. In [other] words, this war is going to start with or without you.

*Id.* (internal emphasis omitted). The Tenth Circuit rejected defendant's arguments that he did not communicate a true threat because he was merely relaying threats made by someone else. *Id.* at 396. While repeating such threats purely for informational purposes would not be illegal, if the communication by the defendant could be "reasonably interpreted as communicating the defendant's *own* intent, purpose, or goal," then they may be held criminally liable for the threat because the defendant has essentially adopted the threat as their own. *Id.*

14

**b.**    *United States v. Bagdasarian*, 652 F.3d 1113 (9th Cir. 2011).

In *United States v. Bagdasarian*, the defendant made two related statements on an online message board concerning then-presidential candidate Barack Obama shortly before his first election in 2008. 652 F.3d at 1115. The first message stated: "Re: Obama fk the n*****, he will have a 50 cal in the head soon." *Id.* The second message, posted shortly after the first, stated: "shoot the n** country fkd for another 4 years+, what n** has done ANYTHING right? ? ? ? long term? ? ? ? never in history, except sambos." *Id.* A reader reported the messages to Secret Service and the defendant was arrested; he was found guilty following a trial on stipulated facts. *Id.* at 1115–16.

The Ninth Circuit began by analyzing whether the statements constituted true threats, and it ultimately determined they did not. *Id.* at 1119. It quickly determined that "[n]either statement is a threat in the normal meaning of the word: 'an expression of an intention to inflict ... injury ... on another.'" *Id.* (quoting *Webster's Third New International Dictionary* 2382 (1976)). The first statement was "a prediction that Obama 'will have a 50 cal in the head soon,'" and it did not convey either an "explicit or implicit threat on the part of [defendant] that he himself will kill or injure Obama." *Id.* As to the second statement, assuming it was "not simply an expression of rage or frustration," was at most "an imperative intended to encourage others to take violent action." *Id.* But the threat statute "does not criminalize predictions or exhortations to injure or kill the president." *Id.*

The Ninth Circuit recognized the alarming, dangerous, and troubling nature of the defendant's statements. *Id.* at 1119–20. Nonetheless, "[h]ere, the meaning of the words is absolutely plain. They do not constitute a threat and do not fall within the offense punished by the statute." *Id.* at 1120.

15

c.    *United States v. White*, **670 F.3d 498 (4th Cir. 2011).**

In *United States v. White*, the defendant made statements in a variety of forms regarding multiple different people. Some of these statements were held to constitute threats, while others were not. This case reflects the fundamental difference between threats and advocating violence.

Defendant was engaged in litigation with Citibank. *White*, 670 F.3d at 502. The first statement held to be a threat indicated that the defendant had obtained personal information of Jennifer Petsche, an employee of Citibank, and he followed that he could make Ms. Petsche "better known to [Citibank's] customers than the security measures you enact at your company indicate you would like." *Id.* He then compared Ms. Petsche to Judge Joan Lefkow, whose family had been murdered. *Id.* at 502 & 512. This was held to be a threat on the basis that the defendant indicating he had paid money to obtain Ms. Petsche's personal information, stating that he intended to take action if Ms. Petsche did not do as he asked, and comparing Ms. Petsche to Judge Lefkow would lead any reasonable person to believe that the statement was a threat of violence against Ms. Petsche and her family. *Id.* at 512.

Defendant separately called the University of Delaware and left a message for Kathleen Kerr, who was involved in a "diversity training program," indicating that the defendant had spoken with Ms. Kerr's husband, knew she was in the office, and that "people that think the way [Ms. Kerr] thinks, we hunt down and shoot." *Id.* at 504. This was also held to be a threat. *Id.* at 512–13.

On the other hand, defendant's statements regarding Richard Warman were held to not be threats. *Id.* at 513. Defendant posted an entry on his personal website titled "Kill Richard Warman, man behind human rights tribunal's abuses should be executed." *Id.* at 505. That entry included the following: "Richard Warman, the sometimes Jewish, sometimes not, attorney behind the abuses of Canada's Human Rights Tribunal should be drug [sic] out into the street and shot, after

16

appropriate trial by a revolutionary tribunal of Canada's white activists. It won't be hard to do, he can be found easily at his home, at [Warman's home address]." *Id.* at 506. This and similar statements by defendant regarding Mr. Warman were held to not be threats *Id.* at 513. "These communications clearly called for someone to kill Richard Warman. But neither communication actually provided a threat from White that expressed an intent to kill Warman." *Id.* "While a direction to others to kill Warman could have amounted to a threat if White had some control over those other persons or if White's violent commands in the past had predictably been carried out, none of that context exists in this case." *Id.* The Fourth Circuit concluded that "the communications that formed the basis of Count 6 were expressions not directed to Warman but to the public generally and did not communicate an intent to take any action whatsoever." *Id.* While the statements "may have undoubtedly frightened Warman, those communications at most conveyed a *serious desire* that Warman be harmed by others but did not convey a *serious expression of intent* to do harm from the perspective of a reasonable recipient." *Id.* at 514 (emphasis in original). Therefore, they were not threats. *Id.*

### d.    *United States v. Wheeler*, 776 F.3d 736 (10th Cir. 2015).

In *United States v. Wheeler*, the defendant made two Facebook posts; the first "urging his 'religious followers' to 'kill cops. Drown them in the blood of their children, hunt them down and kill their entire bloodlines,'" and this message included the specific names of police officers. 776 F.3d at 738. The second post stated: "to my religious followers and religious operatives. if my dui charges are not dropped, commit a massacre in the stepping stones preschool and day care, just walk in and kill everybody." *Id.* The defendant argued these statements could not be threats because they called upon non-existent religious followers to take violent action. *Id.* at 743. He further claimed that his statements were nothing more than advocacy of violence.

The Tenth Circuit rejected that argument: "Speech such as [defendant's] may at first blush appear to be closer to incitement, but fits squarely within the rationale for excluding true threats from First Amendment protection." *Id.* at 745. "Exhorting groups of followers to kill specific individuals can produce fear in a recipient no less than more traditional forms of threats." *Id.* In essence, defendant used the perception that he controlled followers to instill fear in the subjects of his threatening statements because his statements created the belief that others would act at his direction. *Wheeler* rejected the defendant's reliance upon *Bagdasarian* and *White*, distinguishing those cases by pointing out that "where, as here, a reasonable person might believe the individuals ordered to take violent action are subject to the will of the threatening party, such exhortations may amount to true threats." *Id.* at 744. In reaching this conclusion, the Tenth Circuit referenced *United States v. Turner*, in which the defendant made a blog post listing Seventh Circuit judges who "deserve[d] to be killed" alongside photographs, work addresses, room numbers, and a map pointing out anti-truck bomb barriers. *Id.* (citing 720 F.3d 411, 413–14 (2d Cir. 2013)). There, the Second Circuit found those statements, along with the defendant's assertion that these judge's did not "get the hint" following the death of another judge's family members, to be threats because they were statements capable of "instill[ing] in the victim's mind as clear an apprehension of impending injury by an implied menace as by a literal threat." *Turner*, 720 F.3d at 421–22.

> e.    *United States v. Dillard*, **795 F.3d 1191 (10th Cir. 2015).**

In *United States v. Dillard*, the defendant sent letters to a doctor who planned to open an abortion clinic in Wichita, Kansas, following the murder of Dr. George Tiller by an anti-abortion activist. *Id.* at 1196. These letters made reference to the death of Dr. Tiller. Of particular interest are statements in the letter that unnamed "thousands of people" would be looking into the doctor, and that "they" would know her habits and routine, where she shops, who her friends are, and

where she lives. *Id.* This was followed with a statement that "You will be checking under your car everyday—because maybe today is the day someone places an explosive under it." *Id.* The letter concluded with a paragraph including the following: "We will not let this abomination continue without doing everything we can to stop it. We pray you will either make the right choice and use your medical practice to heal instead of kill, or that God will bring judgment on you, the likes of which you cannot imagine." *Id.* at 1197.

The defendant argued that her statements were protected because they did not constitute threats on the basis that an unidentified "someone" might place explosives under the doctor's car. *Id.* at 1200–01. The Tenth Circuit rejected this rationale, noting that "a direct statement of personal intent is not necessary for a jury to find that a communication conveys a threat of injury which will be brought about—rather than merely predicted—by the defendant." *Id.* at 1200. The Tenth Circuit held the context demonstrated "a veiled threat of violence by the defendant or by someone acting under her direction or in conspiracy with her." *Id.* at 1201.

      **f.**    ***United States v. Stevens*, 881 F.3d 1249 (10th Cir. 2018).**

In *United States v. Stevens*, the defendant made numerous statements directed to the Tulsa Police Department, specific officers, and even prosecutors and judges following the shooting death of Terence Crutcher by Officer Betty Jo Shelby. 881 F.3d at 1251. These messages so numerous they are reproduced in Attachment C to this motion. The Tenth Circuit decisively held the statements were true threats. *Id.* at 1254–55. The statements explicitly declare that violent acts would be perpetrated against the subjects, the violence was described in graphic detail, and specific names were mentioned as being the victims of the violent acts. *Id.*

19

**IV.    Mr. Murfin's alleged statements do not, as a matter of law, constitute true threats, nor do they constitute incitement to imminent lawlessness or violence. Therefore, the statements are protected speech and may not serve as the basis of criminal charges.**

To begin, this Court must analyze the statements attributed to Mr. Murfin under the *Watts* line of cases and the true threats test. The charges against Mr. Murfin accuse him of making threats, not with incitement. However, as Mr. Murfin will explain, these statements are protected under the *Brandenburg* incitement test as well.

The statements set out in the Indictment unambiguously do not constitute "threats" as defined by the Tenth Circuit or the Supreme Court. At no point do the statements attributed to Mr. Murfin indicate that the violence *will* occur, merely that it *ought to* occur.

Unlike in *Viefhaus*, Mr. Murfin has not conveyed/repeated threats made by a third person (whether that person exists or not). In *Viefhaus*, the defendants said that bombs *would* be set off, not that they *should* be set off.

Unlike in *Wheeler*, Mr. Murfin has not exhorted a discreet group of followers, or implied through his statements that he has such followers, who would carry out his instructions. In *Wheeler*, the defendant's statements were designed to make the reader believe that the defendant had influence or control over a group of people who would follow through on his instructions to kill police officers and commit a massacre at a daycare center.

Unlike in *Dillard*, Mr. Murfin has not indicated that he knows (or will know) the intimate details of ICE officers' lives and that either he or someone affiliated with him would carry out an act of violence against them. In *Dillard*, the defendant's statements emphatically declared that the doctor's personal details would be known by thousands of people, that she would look under her car for a bomb everyday because someone might put a bomb under it, and that defendant and those

20

like her would "not let this abomination continue without doing everything [they could] to stop it." 795 F.3d at 1197.

Unlike in *Stevens*, Mr. Murfin has not explicitly described the acts of violence that *would* be carried out against specific people and groups. In *Stevens*, the defendant made statements such as, (1) "Betty is not going to get 3 yeas [sic] probation and a pension, she is getting a bullet through her brain," (2) "The last words your child will hear are the same words that will be burned into his or her corpse," (3) "The Tulsa PD Chief is going to be killed," and (4) "The psychotic pile of s- - - who MURDERED the unarmed civilian who broke down is going to be executed, as are ALL psychotic s- - -bags you and other PDs hire across this Nation who murder unarmed civilians. They are all going to be killed." (Attachment C).

While Mr. Murfin's statements might be crude and offensive, they are not threats. As the Tenth Circuit said, threats are those statements "that a reasonable person in the circumstances would understand 'as a declaration of intention, purpose, design, goal, or determination to inflict bodily injury on another.'" *Heineman*, 767 F.3d at 972 (quoting *Viefhaus*, 168 F.3d at 395). The Supreme Court indicated agreement in *Elonis* when it described threats as being communications demonstrating an intent by the speaker to inflict harm upon someone. 575 U.S. at 732–33. Under these standards, this Court need not even reach the "true threat" component of the analysis because the statements do not rise to the level of threats. Even so, these statements do not reflect "serious expressions conveying that [Mr. Murfin] means to commit an act of unlawful violence." *Counterman*, 600 U.S. at 79. Nor do they "convey a real possibility that violence will follow." *Id.*

Even ICE itself did not believe the statements reflected threats: The official U.S. Immigration and Customs Enforcement page on Facebook and on Truth Social posted a photo of Mr. Murfin in handcuffs and described his statements as saying that "federal agents need to be

21

gunned down, shot & executed," not that they *would* be gunned down, shot, and executed, or that Mr. Murfin *would* do those things. (Attachment B).

The statements here are more like those in *Bagdasarian* and regarding Mr. Warman in *White*. "[H]ere, the meaning of the words is absolutely plain. They do not constitute a threat and do not fall within the offense punished by the statute." *Bagdasarian*, 652 F.3d at 1120. The communications were not directed to any specific person "and did not communicate an intent to take any action whatsoever." *White*, 670 F.3d at 513. At their absolute worst, these "communications at most conveyed a serious desire that [ICE agents] be harmed by others but did not convey a serious expression of intent to do harm from the perspective of a reasonable recipient." *Id.* at 514 (emphasis omitted). But even that would be reading too much into these statements. Political language "is often vituperative, abusive, and inexact." *Watts*, 394 U.S. at 708. Mr. Murfin's "only offense here was a kind of very crude offensive method of stating a political opposition to" the activities of ICE agents. *Id.* In reality, Mr. Murfin's statements were little more than an expression of rage at the activities of federal agents around the country; they were not even an expression of serious desire that the violence occur.

No reasonable jury could ever interpret these statements as threats (let alone true threats) given that they do not satisfy the threshold legal standard for a threat. Therefore, the charges against Mr. Murfin must be dismissed.

Normally, indictments are dismissed without prejudice. In this case, however, the indictment against Mr. Murfin should be dismissed *with prejudice* because the United States cannot plausibly make out a cognizable claim that Mr. Murfin's statements constitute incitement to imminent lawlessness or violence under *Brandenburg*. The United States is incapable of demonstrating that these statements were specifically intended to incite others to *imminent*

lawlessness and violence, *Counterman*, 600 U.S. at 76, *Hess*, 414 U.S. at 109, *Brandenburg*, 395 U.S. at 447, and, more significantly, it cannot show that these statements were actually *likely to* lead to *imminent* lawlessness and violence, *Brandenburg*, 395 U.S. at 447.

"[A]t worst, [these statements] amounted to nothing more than advocacy of illegal action at some indefinite future time." *Hess*, 414 U.S.at 108. As the Supreme Court has made abundantly clear, the "mere *advocacy* of the use of force or violence does not remove speech from the protection of the First Amendment." *Claiborne Hardware Co.*, 458 U.S. at 927 (emphasis in original). While these statements included reference to ICE agents needing to be shot or killed, it "did not exceed the bounds of protected speech." *Id.* at 929. "[T]he mere abstract teaching of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action." *Brandenburg*, 395 U.S. at 448. (internal quotation marks and ellipsis omitted).

Nothing about these statements could be compared to someone standing before a crowd, riling them up, and then sending them on their way to do the speaker's bidding. Mr. Murfin did not "steel [readers] to action." *Brandenburg*, 395 U.S. at 448. At worst, he has advocated the moral propriety of killing federal agents. But such advocacy is protected. Even if one could say his words were "loud," they were "puny," *Id.* at 454 (Douglas, J., concurring), and they were not even remotely serious expressions that could plausibly lead to imminent lawlessness and violence.

"Strong and effective extemporaneous rhetoric cannot be nicely channeled in purely dulcet phrases." *Claiborne Hardware Co.*, 458 U.S. at 928. When strong, even violent, language "do[es] not incite lawless action, [it] must be regarded as protected speech." *Id.* "The quality of advocacy turns on the depth of the conviction; and government has no power to invade that sanctuary of belief and conscience." *Brandenburg*, 395 U.S. at 457 (Douglas, J., concurring).

23

In *Yates v. United States*, Justice Black expressed his views on the importance of speech that might be deemed offensive, antagonistic, or even downright hostile to the ruling power or the general public:

> Doubtlessly, dictators have to stamp out causes and beliefs which they deem subversive to their evil regimes. But governmental suppression of causes and beliefs seems to me to be the very antithesis of what our Constitution stands for. The choice expressed in the First Amendment in favor of free expression was made against a turbulent background by men such as Jefferson, Madison, and Mason—men who believed that loyalty to the provisions of this Amendment was the best way to assure a long life for this new nation and its Government. Unless there is complete freedom for expression of all ideas, whether we like them or not, concerning the way government should be run and who shall run it, I doubt if any views in the long run can be secured against the censor. The First Amendment provides the only kind of security system that can preserve a free government—one that leaves the way wide open for people to favor, discuss, advocate, or incite causes and doctrines however obnoxious and antagonistic such views may be to the rest of us.

354 U.S. 298, 343–44 (1957) (Black, J., concurring in part and dissenting in part). Justice Black is correct. There must be freedom to express ideas, even violent ones, if freedom is to be protected. The United States must not be permitted to suppress speech that it deems undesirably violent when such speech is often the simplest, clearest, and loudest manner by which a person may express their disdain for those in power.

24

## CONCLUSION

For the reasons set forth herein, Defendant Logan Christopher Murfin respectfully requests this Court dismiss the Indictment against him, and he requests that it do so with prejudice because the United States cannot plausibly charge him with an offense because the statements attributed to Mr. Murfin are protected under the First Amendment. If this Court disagrees, Mr. Murfin respectfully requests that it dismiss the charges against him without prejudice because the statements do not constitute true threats within the meaning of the First Amendment.

Respectfully submitted,

OFFICE OF THE FEDERAL PUBLIC DEFENDER
Julia L. O'Connell, Federal Public Defender

By:*s/Jared T. Guemmer*
Jared T. Guemmer
Mo. Bar No. 69109
Assistant Federal Public Defender
Office of Federal Public Defender
One West Third St., Ste. 1225
Tulsa, Oklahoma 74103
(918) 581-7656
Jared_Guemmer@fd.org

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 20, 2026, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Stephen Scaife
Assistant United States Attorneys

*s/Jared T. Guemmer*
Jared T. Guemmer
